[Crim. No. 3339.   First Dist., Div. Two.   Feb. 20, 1958.]

THE PEOPLE, Respondent, v. MANUEL FREYTAS et al.,
Appellants.

George T. Davis, Benjamin M. Davis and Don Wilson for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Marvin Christiansen and G. A. Strader, Deputy Attorneys General, for Respondent.

KAUFMAN, P. J.—The defendants were charged by indictment as follows: "MANUEL FREYTAS, JOSE SERRANO, and LOUIS DOE, whose true name is unknown to the Grand Jury are accused by the Grand Jury of the City and County of San Francisco, State of California, by this indictment, of the crime of felony, to wit: VIOLATION OF SECTION 11714 OF THE HEALTH AND SAFETY CODE OF CALIFORNIA, committed as follows: The said MANUEL FREYTAS, JOSE SERRANO, and LOUIS DOE, whose true name is unknown to the Grand Jury on or about the 4th day of August, 1956, at the City and County of San Francisco, State of California, did unlawfully sell, furnish and give away, and did offer to sell, furnish and give a narcotic to Barbara Garcia, a minor. Dated August 20, 1956." Louis Doe was never apprehended. After entering pleas of not guilty the defendants were tried together before a jury

which found them guilty as charged. Defendant Jose Serrano was committed to the Youth Authority; he appeals from the judgment and order denying his motion for a new trial, contending that the verdict is not supported by the evidence and that the trial court erred in its refusal to give certain instructions. Defendant Manuel Freytas was sentenced to the state prison, sentence to run consecutively with any other sentence being served; he appeals from the judgment of conviction, contending that the verdict is not supported by the evidence; that the trial court erroneously admitted evidence of a prior and subsequent sales and incorrectly instructed the jury on the effect of this evidence and certain prejudicial misconduct on the part of the district attorney.

The facts leading to the indictment, according to the prosecuting witness, Barbara Garcia, age 15, are as follows: On Thursday, August 2, 1956, she and her friend, Virginia Ramirez, saw the defendant Freytas, whom she had known for about three months by his nickname ''Golo.'' He told her ''he just got out of jail and he wanted to raise money to get Manuel Nieto out,'' and that ''he had about 20 lbs. he wanted to sell.'' This conversation took place between 3:00 and 6:30 p. m. at the pool hall on 24th Street, owned by the defendant Freytas. On Saturday, August 4, 1956, the defendant Jose Serrano, whom she had known for three to four years by his nickname ''Frenchy,'' came to her house with Manuel Nieto whom she also knew.

She was home alone and Frenchy ''wanted to know if I could get two tins for him. Frenchy said he had to have the stuff by six o'clock p. m. as he had to meet some guy . . .'' She then made several telephone calls but got no result. All three of them left and drove Nieto to the barbershop. Then as she was riding around with Frenchy in his car, she accidentally saw Golo by the pool hall. Frenchy parked the car across the street from the pool hall and remained in the car, while she got out of the car and talked to Golo. The conversation was as follows: ''I asked him if he wanted to take the chance. First I told him that the guy in the car wanted two tins and I asked him if he wanted to take the chance and sell them to me. . . . He said he did, he had about 20 pounds to get rid of . . . I told him that I had to get it before six o'clock, and he said he had to go get it from somebody . . . He said he'd try to get them off this guy. This guy was holding them for him . . . He told us to come back in about a half an hour.''

When she and Frenchy returned, he again remained in the car across the street from the pool hall while she got out to talk to Golo, who "told us to go park on 24th Street between Shotwell and South Van Ness, between Capp and South Van Ness." This they did and then saw Golo walk three blocks up 24th Street and knock on the door to a house. The door was opened by a person known to her only as "Louie," whom she had known for about one month and had seen at the pool hall. Golo talked to Louie and then both of them came back to the car and talked to her and Frenchy. "Golo told me to hand him the money, that Louie would take me and get two tins." Frenchy then gave her $40 which she handed to Golo. Golo took the money, said Louie would go get the two tins and then turned around and walked away. Louie got in the back seat of the car and said to drive to 20th and Shotwell about six blocks away. The car stopped there, Louie got out and walked around the corner. He returned in 20 minutes with two tins and "handed them to me and got in the car. I put them in the front seat, between Frenchy and me."

They then drove to 22d or 23d Street where Louie got out. Frenchy got out of the car and opened the hood and put the two tins in the engine area. She and Frenchy drove back to his home near Precita Avenue. A blond man about 22 whom she had never seen was waiting there in a pink and black '51 Cadillac. Frenchy took the tins out of his car, gave them to the driver of the Cadillac. It was about 6:45 p. m. All three of them got into the Cadillac, Barbara sitting in the middle, drove up to Bernal Heights, and parked in a deserted place. The driver of the Cadillac took some marijuana from one of the tins and put it on blue paper; Frenchy took the seeds out and rolled four cigarettes in brown paper. They smoked two of these cigarettes. The driver lit one cigarette but she was not sure who lit the other one. The driver passed the cigarette around and played the phonograph in the glove compartment of the Cadillac. They left Bernal Heights about 7:30 p. m. and returned to Frenchy's house. There, the Cadillac and its driver left, while Frenchy drove her home in his car, a pink 1949 Ford. After she arrived home, she went out again but returned before 12.

The prosecuting witness further testified that she had been smoking marijuana for about six months, since her release from a tuberculosis hospital in February 1956, and had smoked it about 40 times during that period, always in groups

of people.  She stated that August 4th was the first time she had ever bought any marijuana.  She testified that Frenchy never sold or gave her any marijuana and that August 4th was the only time she had smoked marijuana with Frenchy. Her testimony before the grand jury, a transcript of which was introduced at the trial, substantially corroborated the above facts, except that there was no mention of the conversation with the defendant Freytas on August 2d.

The defendant Serrano took the stand on his own behalf and testified that he would be 20 years old on his next birthday, that he had been employed as a painter by the same firm for the last six years; that he had known the prosecuting witness for three or four years and had taken her out five or six times. As to the events of Saturday, August 4, 1956, he testified as follows: Although he was employed on that date, he stayed home as his mother wanted him to help her.  After taking his mother to and from a launderette, he left home around 11 a. m. and bumped into Manuel Nieto, whom he had known for three years and seen around the pool hall, but did not know had handled narcotics and had just gotten out of jail.  He offered Nieto a ride and Nieto asked to be driven to the barbershop.  He parked across the street from the barbershop around noon and saw Barbara Garcia in the window of her home above the barbershop.  Nieto talked to Barbara and asked her to come down and wait for him while he got his hair cut.  She came downstairs but didn't want to wait in the barbershop, so she and the defendant Serrano sat on her stairs and talked for about 10-15 minutes during which time he asked her to go to a movie with him but she refused.  Then he was called into the barbershop and Barbara went upstairs, returning later when Nieto was getting ready to leave.  The two boys left in the car.  Barbara walked alone towards Mission Street. He dropped Nieto at 26th and Folsom, then went home and stayed there until 4 p. m., where he remained until he went to work at 8 a. m. the next day.

He denied knowing the defendant Freytas until after the arrest but had heard his name and had seen him at his pool hall.  He denied all the other details as related by the prosecuting witness, and further testified that he had never smoked or bought marijuana, although he had been where people smoked; that he had never seen the prosecuting witness smoke marijuana.  He further testified that he also used the name Arbelaez, but preferred Serrano, his mother's name.

A statement he had made to the police after his arrest on

August 16th was then introduced, and contradicted the above testimony as follows: While Manuel was getting his haircut, Barbara went with me to my house in order to get my union card. There, we saw this "kid in a pink Cadillac parked in front of my house. I started to talk to him about going to the river some weekend. Barbara and I got into the car and we drove around the block and then we parked at Bernal Heights and he offered us a drink of whiskey. At first I turned him down because Barbara didn't want a drink and I would have felt out of place drinking. I then took one drink. We then left. He drove us to 24th Street and went to get Manuel. The owner of the car left." The statement also contained further testimony that he had a friend "Rickey" who had a pink Cadillac with a 45 r.p.m. record player in the glove compartment.

He further testified that the above statement was untrue, that he had been kicked six times and hit on the head with a book by several of the four or five police officers who arrested and questioned him from 7:30 a. m. until noon, without any breakfast. Two of the police officers who participated in the arrest and questioning, denied that the defendant Serrano had been threatened, kicked or beaten, but admitted that he had been questioned by several officers for several hours, without breakfast and without the presence of a stenographer or anyone but the officers who took turns in typing his statement. Both of the officers also stated that at all times during the questioning the defendant Serrano denied smoking marijuana or furnishing it to anyone; that no marijuana or any traces thereof was found on his person or in his home. Mrs. Serrano, the defendant's mother, testified that five to six police officers came to arrest her son on the morning of August 16, that one of them pushed her aside to come in and that she saw another grab her son by the hand and push him against the wall.

The witness Olivia Oretger, age 16, testified that she had once in April, May or June, 1956, on a date she could not remember, smoked marijuana with the defendant Serrano, which he had supplied, in a car in front of his house. This occurred after a party and after she had drunk a considerable amount of beer; she was a little high but knew what she was doing, although the marijuana had no effect on her.

First as to the contentions of the defendant Jose Serrano. The defendant Serrano maintains that the only theory on which the verdict can be supported is that he "fur-

nished'' marijuana to the prosecuting witness by passing a cigarette to her during the alleged smoking session on Bernal Heights. As indicated above, the only evidence on this theory is the testimony of the prosecuting witness which was that she was not sure who lit the second cigarette or who handed it to her. However, the testimony of the prosecuting witness indicates that both defendants furnished marijuana to her; that defendants acted together in the entire transaction, the fact that only one of them lit the cigarette is immaterial. The jury chose to believe the testimony of the prosecuting witness, rather than the testimony of the defendant as to these matters, and could properly infer from the testimony of Olivia Oretger that the defendant had supplied her with marijuana and had smoked with her, that the defendant was not telling the truth. ■■■ This is an issue clearly within the province of the jury, Code of Civil Procedure, section 1847, and cannot be disturbed on appeal as it is not the function of a reviewing court to reappraise the credibility of witnesses and reweigh the evidence. (*People* v. *McKinney,* 152 Cal. App.2d 332 [313 P.2d 163] ; *People* v. *De Paula,* 43 Cal.2d 643 [276 P.2d 600].)

■■■ The next question is whether the trial court correctly refused the defendant Serrano's proffered instruction on accomplice testimony and the requirement of corroboration. An accomplice is defined in Penal Code, section 1111, as one ''who is liable to prosecution for the identical offense charged against the defendant on trial.'' As stated in *People* v. *Clapp,* 24 Cal.2d 835 at page 838 [151 P.2d 237] :

''Under the statutory definition, the mere fact that the witness is punishable for his cooperation with the defendant in the illegal transaction does not make him an accomplice. It is necessary to determine whether sections 31 and 971 of the Penal Code or other provisions of the criminal law subject the witness to prosecution under the provisions that the defendant is accused of violating, or whether the acts of the witness participating in the transaction constitute a separate and distinct offense.''

In *People* v. *De Paula,* 43 Cal.2d 643 [276 P.2d 600], in affirming conviction under Health and Safety Code, section 11714 for using a minor to transport narcotics, our Supreme Court held that the instruction had been properly refused as a minor was the victim and not an accomplice, as the minor's offense was the distinct one of ''possession.'' The facts of the De Paula case were that the defendant paid the

minor's room rent and bought her the syringe and needle which the minor used in administering narcotics to him in her room. On one occasion, the defendant gave her some money which she handed to one White who handed her the drug. All three of them then reentered the defendant's car and drove to her room and were apprehended as they were walking from the car. The court pointed out at page 648, that if the defendant in the De Paula case had been charged and convicted of the unlawful possession of narcotics under Health and Safety Code, section 11500, the minor would have been an accomplice as she would have been "liable to prosecution for the identical offense charged against the defendant."

The authorities relied on in *People* v. *De Paula, supra,* are *People* v. *Deibert,* 117 Cal.App.2d 410 [256 P.2d 355], which involved the sale of coca-cola with whiskey to several high school students who were held not to be accomplices; *People* v. *Doetschman,* 69 Cal.App.2d 486 [159 P.2d 418], which involved a charge of statutory rape and contributing to the delinquency of a minor, a violation of Welfare and Institutions Code, section 702; and *People* v. *Baskins,* 72 Cal.App.2d 728 [165 P.2d 510], which involved the solicitation to commit murder, in which it was held that the person solicited was not an accomplice as the "accomplice must stand in the same relation to the crime as the person charged and approach it from the same direction," at page 731. ▮ The purchaser of narcotics is not an accomplice of the seller, as the offense of the purchaser is "possession" and not "selling." *People* v. *Mimms,* 110 Cal.App.2d 310 [242 P.2d 331]; *People* v. *Galli,* 68 Cal.App. 682 [230 P. 20], exceptions to the above view of an accomplice are recognized in case of a conspiracy, *People* v. *Lima,* 25 Cal.2d 573 [154 P.2d 698] and crimes which can be committed only by the cooperation of two or more persons, *People* v. *Wertz,* 145 Cal.App.2d 395 [302 P.2d 613]; *People* v. *McMahon,* 116 Cal.App.2d 883 [254 P.2d 903]. In *People* v. *Ramirez,* 113 Cal.App.2d 842 [249 P.2d 307], it was held that the person hired by state narcotics officers to buy narcotics from the defendant was an accomplice of the defendant charged with the sale of heroin in violation of Health and Safety Code, section 11500, both as a matter of fact and a matter of law.

The defendant here argues that the language "identical offense" means only that the accomplice can be charged under the same Penal Code section as the defendant, that Barbara Garcia, by her own testimony, is an accomplice, as

she obtained the marijuana for the defendant and she could thus also be charged with furnishing narcotics to the minor defendant. The statement we quoted above from *People* v. *Clapp* shows that this view of the statute is erroneous. ·"To be an accomplice one must knowingly, voluntarily, and with common intent unite with the principal offender in the commission of the crime." (*People* v. *Olds*, 154 Cal.App. 2d 78 at 81 [315 P.2d 881].) Furthermore, in the recent case of *People* v. *Drake*, 151 Cal.App.2d 28 [310 P.2d 997], a similar issue to the one here presented was raised. The defendants were charged with the violation of Health and Safety Code, sections 11501 and 11721, inducing and encouraging the minor prosecutrix, Jo Ann Williams, to use a narcotic and be in a place where narcotics were used. In upholding an instruction that Jo Ann was not an accomplice as a matter of law of contributing to the delinquency of the two other minor prosecuting witnesses, Mary Price and Adele Williams, the court said at page 42: "Any claimed act of Jo Ann, the minor, involving these named minors, would be a separate and distinct charge against different victims. (Citing cases)." Thus, if Barbara Garcia here were charged with furnishing narcotics to the defendant Serrano it would be a separate and distinct charge, and not the "identical offense" with which the defendant is charged. We conclude therefore that the trial court correctly refused the proffered instructions about accomplice testimony and the requirement of corroboration.

The court also correctly refused the instructions on included offenses. Although the offense of violating Welfare and Institutions Code, section 702, is necessarily included in the offense defined in Health and Safety Code, section 11714, *People* v. *Krupa*, 64 Cal.App.2d 592 [149 P.2d 416], the mere fact that it is so included does not require the court to give such an instruction unless the circumstances of the case warrant it. *People* v. *Romersa*, 111 Cal.App.2d 173 at 177 [244 P.2d 98]. In *People* v. *De Paula*, 43 Cal.2d 643 at pages 648 and 649 [276 P.2d 600] the court said:

"In the first place, defendant could be convicted of the violation of section 11714 without also being convicted of the violation of section 11500, Health and Safety Code. In the second place, even if possession should be regarded as an included offense in using a minor to transport narcotics, the girl's testimony related to the greater offense (use of the minor to transport narcotics), . . . this case presents no basis for

application of the law on accomplice testimony, the trial court properly refused to instruct upon that theory.''

The defendant Serrano's final contention is that the court erred in refusing to give the cautionary instruction that where the only available direct witnesses are the complaining witness and the defendant, the charge is easy to make and difficult to disprove. He admits that there is no case in this state in which it has been held that such an instruction is required in a narcotics case. As recently pointed out in *People* v. *Hunter,* 146 Cal.App.2d 64, at page 66 [303 P.2d 356], the requirement of such an instruction has not been extended beyond the sex cases. Defendant, citing *People* v. *McGhee,* 123 Cal.App.2d 542 [266 P.2d 874] and *People* v. *Quock Wong,* 128 Cal.App.2d 552 [275 P.2d 778], both pandering cases, that there are other types of cases where the instruction is proper. This may be so where there is no or little other corroborating evidence than that of the prosecuting witness, as in the McGhee and Quock Wong cases. In the instant case, however, there was the evidence of the defendant's statement to the police, made after his arrest. In this statement, contrary to his testimony at the trial, the defendant Serrano admitted being at the scene of the crime. The false and contradictory statements of a defendant in relation to a charge are themselves corroborating evidence. (*People* v. *Farrell,* 133 Cal.App.2d 427 [284 P.2d 29]; *People* v. *Wayne,* 41 Cal. 2d 814 [264 P.2d 547].) There being no merit in any of the above contentions, we conclude that the judgment against the defendant Serrano must be affirmed.

Apart from the testimony of the prosecuting witness set forth in great detail above, the following evidence was offered against the defendant Freytas: A federal narcotics agent stated that with the help of an informer who introduced him to the defendant Freytas, he had bought some marijuana from the defendant Freytas on August 8, 1956. An undercover state narcotics agent testified that he had bought some marijuana from the defendant Freytas on July 13, 1956, at the pool hall on 24th Street. When he attempted to make another purchase on July 17th, the defendant Freytas said: ''No, I am not dealing here anymore; the Federals were in and shook the place down, I am not dealing at all, and people like you don't come back.'' The narcotics bought by these officers were introduced into evidence and identified by expert witnesses. Both of these agents admitted that they did not know the defendant Serrano or anything about the particular

transaction of August 4th which was the subject of the indictment.

The defendant Freytas did not take the stand but offered the following evidence in his behalf. Connie Lamboy, age 17, who knew the prosecuting witness and both defendants, testified that Barbara's reputation for truth and veracity was bad. This statement was corroborated by another witness, Virginia Ramirez, age 16, who also testified that she smoked marijuana, and that she had smoked with Barbara Garcia about 40 times. Virginia further stated that at a dance in June 1956, Barbara had told her and Rose Garcia, that she was mad at Golo, that she thought he didn't like her because she had TB, that if she couldn't have him, no one could and that if they ever got caught smoking marijuana, they were to blame it all on Golo. When arrested on June 6th, Virginia Ramirez gave a statement to the police which stated that she had bought marijuana from Golo about 30 times through Barbara and numerous other connections; that she had smoked with Lupe Martinez, Frenchy Aviles and Shark.

At the trial, Virginia Ramirez stated that portions of this statement were not true, that she had given it only because of what Barbara had told her at the dance and because she was scared of Barbara; that the truth was that she knew the defendant Serrano but had never seen him smoke or smoked with him or heard of him giving marijuana to anyone; nor had she bought any cigarettes from the defendant Freytas or smoked with him.

The witness, Rose Garcia, age 17, testified that she had smoked marijuana with Barbara Garcia and Virginia Ramirez, and corroborated the latter's testimony about Barbara's statements at the dance, the fact that Barbara was mad at the defendant Freytas because of her past relationship with him, and Barbara's bad reputation. She further testified that she had never bought any marijuana from the defendant Freytas or smoked in his presence.

The defendant Freytas first contends that the verdict is not supported by the evidence which at the most shows only the use of a minor in the transportation of narcotics, as the prosecuting witness was used only as an intermediary. However, the jury was not required to believe that portion of the evidence which supports the defendant's theory of the case, *People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778], but could believe the prosecuting witnesses' testimony that although the defendant Freytas knew she was buying the stuff for the ''guy

in the car,'' he took the money from her and arranged for Louie to hand the two tins to her. (*People* v. *Sykes,* 44 Cal. 2d 166 [280 P.2d 769].) There is therefore no merit in this contention.

The defendant Freytas further contends that the trial court improperly admitted the evidence as to his prior and subsequent sales of narcotics to a state and federal agent, and that the introduction of the narcotics involved in those transactions served only to prejudice the minds of the jury.

The rule as to the admissibility of evidence relating to prior crimes was clearly stated in *People* v. *Peete,* 28 Cal.2d 306 at page 315 [169 P.2d 924] :

'' 'The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' (Citing cases.) 'It is true that in trying a person charged with one offense it is ordinarily inadmissible to offer proof of another and distinct offense, but this is only because the proof of a distinct offense has ordinarily no tendency to establish the offense charged. But whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion.' *People* v. *Walters,* 98 Cal. 138, 141 [32 P. 864] ; (*People* v. *Ellis,* 188 Cal. 682, 689 [206 P. 753] ; *People* v. *Ebanks,* 117 Cal. 652, 663 [49 P. 1049, 40 L.R.A. 269].)''

This rule has been consistently followed and cited with approval, most recently in *People* v. *Moore,* 48 Cal.2d 541 at p. 547 [310 P.2d 969] ; *People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769] ; *People* v. *Quisenberry,* 151 Cal.App.2d 157, 163 [311 P.2d 99]. In *People* v. *Torres,* 98 Cal.App.2d 189, [219 P.2d 480], somewhat similar in its facts to the instant case, in rejecting the identical contention the court, after citing the Peete case, said at page 192 :

''Evidence of other acts of a similar nature may be admitted when not too remote, to prove a material fact, or where it tends to show motive, scheme, plan or system, or to show *guilty knowledge* and intent. (*People* v. *Henderson,* 79 Cal. App.2d 94, 119 [179 P.2d 406] ; *People* v. *Hennessey,* 201 Cal.

568, 582 [258 P. 49]; *People* v. *Brown,* 72 Cal.App.2d 717, 720 [165 P.2d 707]; *People* v. *Bercovitz,* 163 Cal. 636, 639 [126 P. 479, 43 L.R.A.N.S. 667].)''

The court further indicated that the evidence of defendant's prior acts of transporting marijuana was relevant to show knowledge of the presence of the drug in his automobile on the later occasion, and that the remoteness of the evidence was a question for the jury, while the question of whether or not it was too remote rested in the discretion of the trial court. Since *People* v. *Winston,* 46 Cal.2d 151 [293 P.2d 40], the prosecution in narcotics cases has had the burden of proving that a defendant knew the objects in his possession were narcotics; more recently it has been held that the type of evidence here introduced is relevant for such purpose, its weight to be determined by the jury. (*People* v. *Torres,* 140 Cal.App.2d 751 [295 P.2d 904]; *People* v. *Tabb,* 137 Cal.App. 2d 167 [289 P.2d 858].)

Defendant contends that the evidence could not be admissible to show knowledge or intent or common plan or scheme as the defendant denied the charge. ▮▮▮ However, in *People* v. *Channell,* 136 Cal.App.2d 99 at 112 [288 P.2d 326], the court pointed out: ''Evidence of other offenses should be admitted for the purpose of showing intent only when the intent accompanying the act is equivocal, or where it is claimed by the defendant that the act was the result of mistake, accident, or inadvertence, or where intent is otherwise denied.''

Defendant argues that the evidence should not have been admitted. The other sales were distinct and independent offenses, since they were not sales to minors. However, we think that the other sales were circumstances corroborating the testimony of the prosecuting witness of the alleged sale to her on August 4, 1956. ▮▮▮ Evidence of other acts of a similar nature may be admitted when not too remote to prove a material fact or when they tend to show motive, scheme, plan or system and such similar acts may be either before or after perpetration of the crime charged, *People* v. *Darnell,* 97 Cal. App.2d 630 [218 P.2d 172].

In *People* v. *Bean,* 149 Cal.App.2d 299 [308 P.2d 27], it was held that evidence of possession of narcotics 17 days after the offense charged was admissible to show familiarity with the drug as well as plan, scheme or guilty knowledge, particularly where the court cautioned the jury that the defendant was not being tried for such possession. In the instant case the court also so cautioned the jury. ▮▮▮ We can see no error,

therefore, in the admission of the evidence objected to, nor in the instructions to the jury on the consideration of such evidence.

Defendant Freytas' final assignment of error is that the prosecuting attorney committed prejudicial misconduct when the witness Rose Garcia was off the witness stand; he pointed to the back of the room to two or three people standing here, one of whom was a Negro, and asked: "Is this your husband here to see you?" The court made the following remark about this incident:

"THE COURT: Well, as a matter of fact, I recall that incident. There were two or three people standing in the back of the court. Only one of them was colored and, as I looked and saw at the time, there wasn't one of the jurors that was looking in that direction, at the time. The thing came and went, was over. There was no designation of any individual, at all, and no characterization of the person at the time."

There is nothing in the record outside of the remarks of the defendant's counsel to show such alleged conduct; no affidavit was filed and as the trial court observed nothing calling for an admonition, we find no prejudicial misconduct and no reversible error. (*People* v. *Buratti*, 96 Cal.App.2d 417 [215 P.2d 500].)

There being no merit in any of the contentions of the defendant Freytas, the judgment of conviction must be sustained.

In view of the foregoing the judgments of conviction must be and are hereby affirmed.

Draper, J., concurred.

DOOLING, J.—I concur. However, as applied to the facts of this case, I cannot agree with some of the sweepingly general language of the main opinion in considering the application of the exception to the general rule that evidence of other crimes is not admissible against a defendant in the trial of a criminal case. No rule is better settled than the one that proof of other crimes is generally not admissible. The exception is applied only when the evidence of other crimes tends to prove a material facts in the trial of the particular case. (*People* v. *Peete*, 28 Cal.2d 306, 315 [169 P.2d 924].) If the exception is too loosely or generally applied without the materiality of the evidence of other crimes to prove a material fact in the particular case being actually established the time may well

come when the exception will for all practical purposes swallow up the rule.

As I read the main opinion it relies on two branches of the exception: 1. that evidence of other similar crimes committed in a particular or distinctive manner may be proved to establish a common plan, design or system and 2. that evidence of other crimes may be admitted to prove guilty knowledge and intent.

I cannot agree that under the evidence in this case the proof of the other sales was admissible to prove a common plan, design or system. The only thing in common in the crimes here proved is that they were all sales of marijuana. The sales to the officers were not made in the same manner at all as the sale to the minor with which the defendant Freytas was charged in this proceeding. They did not follow any common or distinctive pattern of operation. It is well settled that evidence of other similar crimes is not admissible to prove "criminal propensity on the part of the accused to commit the crime charged." (*People* v. *Westek*, 31 Cal.2d 469, 476 [190 P.2d 9].) To hold that evidence of any sales of marijuana, however dissimilar the manner in which they were handled, may be admitted to show a common plan, system or design is to stretch and distort this exception to the point where there is no distinction between evidence to show common plan, design or system and evidence to show "criminal propensity on the part of the accused to commit the crime charged." As so applied the exception has, in fact, already swallowed up the rule. I therefore must dissent from the portion of the opinion which relies in this case on the exception based on proof of common plan, design or system.

I agree that in this case the proof of the other sales was material to prove knowledge and intent, for the following reason not developed in the main opinion. The complaining witness testified that she arranged to purchase "two tins" from Freytas and that a "tin" among marijuana users meant a tobacco can filled with marijuana. The word "marijuana" was not at any time used in her conversations with Freytas. It therefore became material to prove that Freytas understood the words "two tins" to refer to two tobacco cans containing marijuana and that that was what he intended to sell through his confederate, who made the actual delivery in his absence. The evidence of other sales of marijuana shortly before and after this transaction was material to prove that Freytas understood the words "two tins" as referring to marijuana,

the commodity in which the evidence of the other sales shows that he was dealing at about that time. Whether proof of other sales may be introduced to prove knowledge and intent depends on the facts of the particular case. It should not be admitted where such knowledge and intent are otherwise so clearly established that they are not a real issue in the case (*People* v. *Spencer*, 140 Cal.App.2d 97, 104 [294 P.2d 997]), but in this case for the reasons given I agree that the evidence was properly admitted.

A petition for a rehearing was denied March 21, 1958, and appellants' petition for a hearing by the Supreme Court was denied April 17, 1958. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.